**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re United American Healthcare Corporation
Securities Litigation

                                             Master File No. 2:05-CV-72112
                                             (LPZ/RSW)

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on January 30, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

This matter is before the Court upon Defendants' Motion to Dismiss (Docket # 21) pursuant

to FED. R. CIV. P. 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4 *et seq*. Defendants United American Healthcare Corp. ("UAHC"),

William Brooks, Tom Goss, Stephen Harris, Gregory H. Moses, and William E. Jackson, filed their

motion on July 19, 2006, and Defendant Osbie Howard subsequently joined and concurred in this

motion.[1] Plaintiffs filed their consolidated response on September 6, 2006. Defendants have since

replied. The Court finds that the facts and legal arguments are adequately presented in the parties'

papers and the decision process would not be significantly aided by oral argument. Therefore,

_____

[1]The Court will refer to Defendants collectively as UAHC unless the circumstances
require more particularity.

pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted.

This is a putative class action on behalf of all persons who purchased UAHC securities during the period from May 26, 2000, through April 22, 2005. Initially, two separate complaints, *Zaluski, et al., v. United American Healthcare Corp.*, Case No. 05-72112, and *Coleman v. United American Healthcare Corp.*, Case No. 05-72384, were filed against UAHC and certain officers and directors. These cases were subsequently consolidated as *Coleman v. United American Healthcare Corporation, et al.*, Case No. 05-72112, and on May 4, 2006, Plaintiffs submitted a Consolidated Amended Complaint ("CAC"), in which they alleged violations of the anti-fraud provisions of the federal securities laws. For the following reasons, Defendants' Motion to Dismiss is GRANTED.

## II. BACKGROUND

UAHC is a Michigan corporation in the business of providing comprehensive management and consulting services to managed care organizations located in Tennessee and Michigan. *See* CAC ¶ 7. UHAC is the sole owner of OmniCare Health Plan, Inc. ("OmniCare"), a health maintenance organization ("HMO"), also known as a managed care organization ("MCO"), with about 130,000 members all in the state of Tennessee.[2] *See id.* ¶ 7. OmniCare has recently been renamed UAHC Health Plan of Tennessee, Inc. *See id.* ¶ 7.

Defendant William Brooks has been Chairman of UAHC since 1998, and President and CEO since November 2002. *See id.* ¶ 8. Mr. Brooks was also a director of OmniCare during the proposed class period. *See id.* Defendant Stephen D. Harris has been UAHC's Chief Financial Officer,

_____

[2]Prior to 2002, UAHC's wholly owned subsidiary, United American of Tennessee, Inc. ("UATN"), owned a 75% interest in OmniCare.

2

Treasurer and Principal Accounting Officer since 2002. *See id.* Defendant Osbie Howard was a director and Senior Vice President of UAHC and CEO of OmniCare from 1995 until his resignation in April 2005. *See id.* Defendant William Jackson served as UAHC's Chief Financial Officer from August 2000 until October 28, 2002. *See id.*

OmniCare is an MCO in the business of delivering healthcare services in Western Tennessee to individuals enrolled in Tennessee's TennCare Program. *See* CAC ¶ 19. TennCare is owned and operated by the State of Tennessee and replaced the state's Medicaid program. *See id.* ¶ 21. TennCare extended healthcare coverage to uninsured and uninsurable persons who were not eligible for Medicaid and offers its services through several licensed MCOs that have contracts with TennCare, including OmniCare. *See id.* This contract is between OmniCare and the State of Tennessee, doing business as TennCare, and is known as the Amended and Restated Contractor's Risk Agreement ("CRA"). *See id.* ¶ 23. The CRA, through OmniCare, has accounted for a substantial portion of UAHC's revenue and earnings since 1999, including over 99% of its revenue in 2004. *See id.* ¶ 24; Defs.' Reply at 2 fn. 2.

As conditions of doing business with TennCare, the CRA contains several provisions to prevent improprieties between state employees and government contractors such as OmniCare. Section 4-7 prohibits conflicts of interests and states that OmniCare

> warrants that no part of the total Agreement amount provided herein shall be paid directly or indirectly to any officer or employee of the State of Tennessee as wages, compensation, or gifts in exchange for acting as officer, agent, employee, subcontractor, or consultant to [OmniCare] in connection with any work contemplated or performed relative to this Agreement unless otherwise authorized by the Commissioner, Tennessee Department of Finance and Administration.

CAC Ex. 1 at 189. Similarly, section 4-11 requires OmniCare to signify that "no member of or a delegate of Congress, nor any elected or appointed official or employee of the State of Tennessee

... or any other federal agency has or will benefit financially or materially from this procurement."
*Id.* at 196. Finally, by entering into the CRA, OmniCare certified that "to the best of its knowledge
and belief ... Federal funds have not been used for lobbying in accordance with 45 C.F.R. § 93,
Appendix A." *Id.* Section 4-8 of the CRA outlines a myriad of consequences that could follow in
the event that OmniCare failed to meet the CRA's requirement, including sanctions, liquidated
damages, loss of enrollees, civil penalties, limitation of service area, appointment of temporary
management, suspension of new enrollment, suspension of payments, and further sanctions allowed
under state statute or regulation. *See id.* at 190.

During the proposed class period, John Ford was a Tennessee State Senator who sat on three
legislative committees with TennCare oversight. *See* CAC ¶ 25. Senator Ford was also involved with
a Philadelphia based firm called Managed Care Services Group, Inc. ("MCS"), in which Defendant
Howard was also a partner. *See id.* ¶ 116. MCS provided services for Doral Dental, a dental HMO,
and assisted Doral in obtaining a contract with TennCare. *See id.* ¶ 117. In total, Doral paid $1.1
million to MCS, which in turn paid Senator Ford more than $237,000 in 2002 and 2003. *See id.* ¶
118. According to Doral, Senator Ford's work was limited to promoting Doral's business in states
outside of Tennessee; however, Doral ended its contract with MCS in February 2005 when its
relationship to Senator Ford came to light. *See id.* ¶ 117; CAC Ex. 6. These dealings sparked an
investigation into Doral and Senator Ford's other consulting relationships, including inquiries by
the Tennessee Attorney General and the Senate Ethics Committee. *See* CAC ¶¶ 119-20. The
Attorney General's report expressed the opinion that Senator Ford's consulting was not performed
entirely outside of Tennessee. *See id.* ¶ 119. Furthermore, the chair of the Senate Ethics Committee

stated that Senator Ford failed to disclose his consulting deals on required state forms and lied to the Committee. *See id.* ¶ 120.

On February 10, 2005, the Tennessee Department of Commerce and Insurance ("the Department of Commerce" or "the Department") sent a letter to Defendant Howard asking him to describe the nature of the business relationships between UAHC and MCS. *See* CAC, Ex. 3 ¶ 10. Defendant Howard responded that UAHC did not have any business relationships with MCS. *See id.* ¶ 11. The Department of Commerce also asked OmniCare to review its consulting contracts to determine whether they were in compliance with the terms of the CRA and to provide copies of any non-complying contracts. *See id.* ¶ 12. On March 1, 2005, OmniCare stated that all of its contracts were in compliance. *See id.* However, various news sources reported that Senator Ford advocated on behalf of OmniCare, and a letter from an OmniCare lobbyist was found in Senator Ford's office along with proposed amendments to bills relating to TennCare and OmniCare. *See* CAC ¶¶ 111-13. Moreover, according to Bridgette Green, a former senior vice-president of OmniCare, in December 2003 she learned that UAHC had been paying Senator Ford over $100,000 a year for consulting services. *See id.* ¶ 26.

Amid the controversy surrounding Doral Dental, UAHC issued a press release on April 15, 2005, quoting Defendant Brooks as follows:

> Earlier today United American Healthcare Corporation (UAHC), the parent company for UAHC Health Plan of Tennessee (formerly known as OmniCare Health Plan of Tennessee) (the "Health Plan"), notified officials of the Tennessee Department of Finance and Administration of UAHC's prior business relationship with Tennessee State Senator John Ford (D-Memphis) ....
>
> In 2001, UAHC decided to explore expansion of its business to other southern states beyond Tennessee and retained Sen. Ford as a consultant to assist in this expansion. Because this arrangement was with UAHC and not the Health Plan, and because Sen. Ford's activities as a consultant related solely to marketing activities outside the State

5

of Tennessee, UAHC believes that its agreement with Sen. Ford was lawful and complied with the provisions of the TennCare contract between the State of Tennessee and the Health Plan.

However, in light of the recent public controversy in Tennessee regarding the regulation of consulting arrangements involving legislators and in the interest of avoiding any further distractions that might negatively impact the TennCare program and the 130,000 TennCare enrollees who are served by the Health Plan, UAHC terminated its contract with Sen. Ford effective March 11, 2005.

In addition, UAHC and the Health Plan were recently made aware of the involvement of Osbie Howard in Managed Care Services Group ....

The Health Plan has notified the Tennessee Department of Finance and Administration that, effective immediately, Osbie Howard has retired as Chief Executive Officer of the Health Plan and resigned from all executive officer, director and other positions with UAHC and its subsidiaries ....

CAC ¶ 106. UAHC subsequently admitted making 42 monthly payments to Senator Ford of approximately $10,000 each for a total of $420,000 before terminating the agreement on March 11, 2005. *See id.* ¶ 28.

This announcement prompted the Department of Commerce to issue an order on April 20, 2005, placing OmniCare and UAHC under administrative supervision pursuant to Tennessee statutory and administrative rules. *See* CAC, Ex. 3 ¶ 19-22. The order stated that Defendant Howard and OmniCare had provided false information to the Department on February 15, 2005, and March 1, 2005, in response to the Department's inquiries into OmniCare's relationship with MCS. *See id.* ¶ 15. The order further stated that "[b]ecause of recent events, including possible violation of the TennCare Contractor Risk Agreement regarding prohibitions against conflicts of interest ... it is likely that [OmniCare's] parent companies are or will be experiencing financial pressures." *Id.* ¶ 17. As a result, the Department concluded that it was necessary to supervise the operations of OmniCare and its parent companies, including UAHC for a period of time pending a full investigation of the

6

potential violations of the CRA. When news of the order became public on April 21, 2005, UAHC's stock price immediately dropped from about $5.50 to $2.11 per share. *See* CAC ¶ 46. The period of administrative supervision expired on December 31, 2005, and Tennessee has yet to determine whether the CRA was breached.

Plaintiffs are individuals who purchased UAHC securities during the period from May 26, 2000, through April 22, 2005, and experienced a loss due to the stock's drop in price following the news of the April, 2005, order. *See id.* ¶ 1. Plaintiffs claim that UAHC and the individual Defendants violated the anti-fraud provisions of the federal securities laws by failing to disclose UAHC's alleged breach of the CRA and its possible consequences, and seek to recover damages caused by these alleged violations.

### III.  LEGAL STANDARDS

A motion brought pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief may be granted tests the legal sufficiency of Plaintiffs' claims. The Court must accept as true all factual allegations in the pleadings, and any ambiguities must be resolved in Plaintiffs' favor. *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 577-78 (6th Cir. 1992). While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *See Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 319 (6th Cir. 1999). Furthermore, the Court need not accept as true legal conclusions or unwarranted factual inferences. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). The Court may properly grant a motion to dismiss when no set of facts exists that would allow Plaintiffs to recover. *See Carter by Carter v. Cornwall*, 983 F.2d 52, 54 (6th Cir. 1993).

In deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the Court may only consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the [Court] may take judicial notice." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 12.34[2] (3d ed. 2000). If, in deciding the motion, the Court considers matters outside the pleadings, the motion will be treated as one for summary judgment pursuant to FED. R. CIV. P. 56. *See* FED. R. CIV. P. 12(b).

Additionally, Plaintiffs must overcome the heightened pleading standards for securities fraud set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. 78u-4 *et seq*. The PSLRA mandates that securities plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, "the complaint, shall with respect to *each act or omission* alleged to violate this chapter, state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). If either of these mandates are not met, "the court shall, on the motion of any defendant, dismiss the complaint ...." 15 U.S.C. § 78u-4(b)(3).

While the PSLRA did not change the standards applicable to Rule 12(b)(6) motions to dismiss, securities fraud complaints are subject to a more stringent 12(b)(6) scrutiny. *See Helwig v. Vencore, Inc*. 251 F.3d 540, 553 (6th Cir. 2001);  *D. E. & J. Ltd. P'ship v. Conway*, 284 F.Supp.2d 719,  743 (E.D. Mich. 2003). Whereas under Rule 12(b)(6) plaintiffs would be given the benefit of all reasonable inferences and complaints would be dismissed only if it was clear that no set of facts could be proven to support the plaintiffs' claim for relief, under the PSLRA the inferences to be

8

drawn from the plaintiffs' propositions of fact must be reasonable and strong, and plaintiffs are "entitled only to the *most plausible* of competing inferences." *Helwig*, 251 F.3d at 553 (emphasis added).

## IV. ANALYSIS

In the present case, Plaintiffs claim that UAHC and the individual Defendants made misleading statements and omissions in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. In order to state a claim under § 10(b) and Rule 10b-5, "a plaintiff must establish (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury." *Helwig*, 251 F.3d at 554.

UAHC's Motion to Dismiss attacks the sufficiency of Plaintiffs' CAC on several grounds. First, UAHC argues that Plaintiffs have failed to adequately plead that UAHC had a duty to disclose the alleged breach of the CRA. Next, UAHC contends that Plaintiffs have failed to plead facts with sufficient particularity to support a strong inference of scienter for each individual Defendant. Further, as an alternative argument, UAHC argues that Plaintiffs' CAC fails to plead any facts supporting a strong inference of scienter prior to December 2003 and, therefore, any allegations of misstatements prior to December 2003 should be stricken from the pleadings. Finally, UAHC asserts that the CAC contains no allegations with respect to Defendants Goss and Moses, and Plaintiffs' claims should be dismissed against them for that reason.

As an initial matter, the Court agrees with UAHC that Plaintiffs' CAC fails to plead facts with sufficient particularity that lead to a strong inference of scienter for any Defendant prior to December 2003. The only allegations of scienter prior to December 2003 consist of bare assertions

9

of the individual Defendants' positions with UAHC and the fact that, because of those positions, they had access to inside information. Such assertions are plainly insufficient in light of PSLRA's heightened pleading standards and FED. R. CIV. P. 9(b). *See D. E. & J.,* 284 F.Supp.2d at 743; *accord In re Citigroup, Inc., Sec. Litig.*, 330 F.Supp.2d 367, 382 (S.D. N.Y. 2004). Accordingly, none of the statements prior to December 2003 alleged to be misleading are actionable under § 10(b) or Rule 10b-5.[3] Finally, notwithstanding the Court's conclusion regarding scienter, the statements prior to December 2003 are not actionable for the same reasons discussed below.

### A.  Alleged Omissions of Material Facts

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b). Pursuant to SEC Rule 10b-5, it is unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ...." 17 C.F.R. § 240.10b-5(b). The CAC "is based entirely on Defendants' failure to disclose that OmniCare had materially breached the CRA and was thus in immediate risk of losing its sole source of revenue and subject to substantial financial and other penalties." CAC ¶ 127.

---

[3]In fact, the CAC alleges that statements made in 2000 were misleading for failing to disclose UAHC's involvement with Senator Ford. The Court is perplexed as to how Plaintiffs could assert, consistent with FED. R. CIV. P. 11, that these statements were misleading when it is clear that UAHC did not begin to make payments to Senator Ford until 2001.

It is axiomatic that "[b]efore liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *Murphy v. Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (*citing Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988)). Furthermore, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner, Inc., Sec. Litig.*, 9 F.3d 259 (2nd Cir. 1993). Rather, there must be an affirmative duty of disclosure. *See Basic*, 485 U.S. at 239 n. 17 (stating "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."). An affirmative duty of disclosure arises if "(1) created by SEC statute or rule; (2) there is insider trading; or (3) there was a prior statement of material fact that is false, inaccurate, incomplete or misleading in light of the undisclosed information." *In re Ford Motor Co., Sec. Litig.*, 184 F.Supp.2d 626, 631-32 (E.D. Mich. 2001), *aff'd*, 381 F.3d 563 (6th Cir. 2004).

### 1.  *"Duty to Disclose" and the "Duty to Disclose Fully"*

UAHC's principle argument is that it did not have a duty to disclose the alleged breach of the CRA and the possible consequences stemming from such a breach. UAHC contends that such information is a matter of opinion and is considered "soft information." As such, UAHC asserts that it had no duty to disclose this information. Further, UAHC argues that Plaintiffs have not alleged facts to demonstrate UAHC had a duty to disclose this information in order to make prior statements not misleading. In response, Plaintiffs argue that this is a duty to disclose fully case and contend that UAHC had an independent duty to disclose the payments to Senator Ford and the risk of termination of the CRA to avoid misleading investors. Further, Plaintiffs argue that whether this information is characterized as "soft information" is irrelevant because its disclosure was necessary to give investors a complete picture of the CRA.

11

UAHC relies on the holding in *Murphy v. Sofamor Danek Group, Inc.*, for the proposition that there is no duty to disclose soft information until it is virtually as certain as a hard fact. In *Sofamor Danek*, the defendant company was in the business of developing, manufacturing and marketing spinal implant devices, which were subject to approval by the Food and Drug Administration ("FDA"). *See Sofamor Danek,* 123 F.3d at 397. While the defendant's products had been approved for certain uses, the use of bone plates and sacral screws for pedicular attachment was considered a new use, and, consequently, the defendant was prohibited from promoting such a use. *See id.* The FDA issued warnings to the defendant and similar companies that regulatory action would be taken if they engaged in unapproved marketing. *See id.* The defendant disclosed the marketing prohibition and the warning in its prospectus, yet allegedly continued to allow doctors to use the products in a prohibited manner. *See id.* at 397-98. Following a television report on the dangers of using sacral screws for pedicular attachment, the FDA issued a report affirming these dangers, giving rise to several lawsuits against the company. Upon disclosure of these suits, the defendant's stock dropped in price, and the plaintiffs filed the suit at issue. *See id.* at 398-99.

The plaintiffs claimed that the defendant committed securities fraud for not disclosing the possible illegality of its marketing practices with regard to certain surgical devices, specifically that the company and certain officers "made deceptive and materially false and misleading statements which, coupled with the defendant['s] failure to disclose information that allegedly ought to have been disclosed, caused the company's stock to trade at artificially high prices." *Id.* at 399. The district court dismissed the case and the Sixth Circuit upheld the dismissal, finding that the defendant had no duty to disclose. *See id* at 400.

12

The court rejected the plaintiffs' theory that the defendant's statements regarding record revenues, increases in sales, and the company's explanations thereof gave rise to a duty to disclose the illegal marketing because they created the impression that the results were due to legitimate sales. *See id.* at 401. The company had disclosed record revenues and sales, attributing the results to "growth in the number of spinal implant operations being performed, increased demand for the company's products for use in these operations, favorable shifts in the sales mix, 'leveraging' of fixed manufacturing costs and general administrative expenses, improved manufacturing efficiencies, an increase in prices for selected spinal systems, the introduction of new products, and expanded international sales." *Id.* at 401.

Noting that the public was aware of the FDA warning, the court found there was no further duty to disclose soft information such as predictions regarding future regulatory actions or losses the company may suffer as a result. *See id.* at 402. The court characterized the company's statements as disclosing hard information and pointed out that the plaintiffs did not allege any affirmative misstatement in the numbers or the company's analysis. *See id.* at 401. The court pointed out that the disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future. *See id.* at 401 fn. 3. Since the defendant's statements were hard information, and the plaintiffs did not allege facts contradicting these statements, the court concluded that there was no further duty to speculate as to the legality of the company's marketing practices. *See id.* at 401-02. The court stated that "our cases firmly establish the rule that soft information must be disclosed only if ... virtually as certain as hard facts." *Id.* at 402 (*quoting Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)).

13

In contrast to UAHC, Plaintiffs argue that *Sofamor Danek* is inapplicable to the present case and that the Sixth Circuit's decision in *Helwig v. Vencor, Inc.,* is controlling. The court in *Helwig* distinguished *Sofamor Danek's* duty to disclose from a separate and distinct duty to disclose fully. *See Helwig*, 251 F.3d at 561-62. The defendants in *Helwig* had made projections regarding quarterly earnings and stated that they were comfortable that these projections would hold. *See id.* at 545. These statements were made prior to the passage of the Balanced Budget Act, which the defendants knew would have detrimental effects on the company's viability if passed. *See id.* at 546.  Further, the defendants had made statements to employees warning of the hard times to come following the passage of the Act. *See id.*

The plaintiffs in *Helwig* claimed that the company's statements regarding its earnings projections and its confidence in those projections were misleading absent disclosure of the company's information concerning the possible effects of the Balanced Budget Act. *See id.* at 559. The court agreed with the plaintiffs, distinguishing the situation from that in *Sofamor Danek*. *See id.* at 561. The court recognized that silence absent a duty to disclose is not misleading under Rule 10b-5, but nevertheless concluded that when a defendant does speak on an issue, it is required to provide complete and non-misleading information. *See id.* The court stated: "[w]ith regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known–but it may not choose half-truths." *Id.* at 561.

Like the plaintiffs in *Helwig*, Plaintiffs in the present case argue that UAHC chose to speak about the CRA, giving rise to a duty to fully disclose information such as the alleged breach of the CRA and the possible consequences. Without these disclosures, Plaintiffs contend, UAHC's

14

discussions of the CRA misled investors because they could not assess the riskiness of the investment.

### 2. *Application to the Present Case*

The Court finds that Plaintiffs' reliance on *Helwig* is misplaced because the statements alleged to be misleading in the present case are dissimilar from the statements giving rise to a duty to disclose in *Helwig*. The CAC contains numerous excerpts from UAHC's quarterly and annual reports concerning the CRA dating back to September 2000. However, as mentioned above, the Court finds that Plaintiffs have not pled any facts supporting a strong inference of scienter prior to December 2003. Therefore, only those statements after December 2003 could possibly be actionable under § 10(b) and Rule 10b-5. These statements are included in UAHC's January 2004 quarterly report, April 2004 quarterly report, August 2004 annual report, October 2004 quarterly report, January 2005 quarterly report, and the April 15, 2005, press release quoting Defendant Brooks. *See* CAC ¶¶ 92, 94, 96, 99, 101, 106.

With the exception of the April 15, 2005, press release, Plaintiffs allege, without identifying specific statements, that the quarterly and annual reports are "false and misleading for omitting to state that OmniCare had breached the CRA, that the CRA was currently subject to immediate termination by TennCare, and that OmniCare was subject to substantial monetary penalties as a result of its breaches of the CRA ...." CAC ¶¶ 93, 95, 97, 100, 102. Plaintiffs do not allege the existence of any affirmative misstatements but argue that the failure to disclose the alleged breach caused the quarterly and annual reports to become misleading, comparing the present case to the duty to disclose fully in *Helwig*. While the Court agrees with Plaintiffs' proposition that the characterization of the information as "soft information," by itself, does not necessarily relieve

15

UAHC of a duty to disclose that information, the Court finds that Plaintiffs' arguments are without merit because they overlook the difference between the statements the defendants in *Helwig* did make and those of UAHC.

The *Helwig* court found a duty to disclose fully based on the representations contained in the defendants' statements and the inferences a reasonable investor would draw from them under the circumstances. Unlike the statements giving rise to the defendants' duty to disclose in *Helwig*, UAHC's statements do not contain any implicit representations that would mislead a reasonable investor under the circumstances in which they were made. In *Helwig*, the defendants had reason to know that the Balanced Budget Act would be detrimental to its future earnings. In spite of this knowledge, the defendants still informed analysts that they were comfortable with the favorable earnings projections made prior to the Budget Act. The Court found that the statements of comfort contained the factual assertions "(1) that the statement [was] genuinely believed, (2) that there [was] a reasonable basis for that belief, and (3) that the speaker [was] not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *Id.* at 557. Thus, without qualifying the statements by disclosing what knowledge they had about the potential effect of the Act, the defendants' representations created the false impression that the company would maintain its earnings despite the Balanced Budget Act. The court found that under the circumstances disclosure was necessary despite the fact that the defendants' information on the possible effects of the balanced budget act could be considered soft information.

In the present case, unlike *Helwig*, Plaintiffs do not allege any facts that contradict UAHC's actual statements regarding the CRA or that cause them to become misleading. Plaintiffs' entire claim rests on their conclusory allegation that the CRA was repeatedly breached. However, like

16

*Sofamor Danek* and in contrast to *Helwig*, virtually all of UAHC's statements regarding the CRA consisted of accurate historical facts. UAHC stated that the CRA had been renewed,[4] described changes in the terms of the agreement,[5] described how OmniCare had met its statutory net worth requirement,[6] and stated the date the amended CRA was scheduled to end.[7] *See* CAC ¶¶ 92, 94, 96, 99, 101. In context, the statements regarding the CRA are generic and innocuous and, unlike the statements in *Helwig*, make no representations about the future of UAHC's business or the future of the CRA. *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (stating "it would be unreasonable for someone to take a report strictly concerned with the past as a representation about the future ...").

In order to give the appearance that UAHC touted the CRA and extolled the future revenues it would produce, Plaintiffs have selectively quoted and taken out of context portions of UAHC's

---

[4] "In September 2002, OmniCare-TN and the State of Tennessee, doing business as TennCare, amended the [CRA] between them." CAC ¶ 92 (*quoting* UAHC's January 2004 quarterly report). *See also id.* ¶¶ 96, 99, 101.

[5] "The new contract provided for increased capitation rates, but eliminated the practice of providing retroactive payments to managed care organizations for high cost chronic conditions of their members ('adverse selection') and payments earmarked as adjustments for covered benefits." CAC ¶ 96 (*quoting* UAHC's August 2004 annual report). *See also id.* ¶¶ 92, 101.

[6] "Pursuant to the [2002] amendment, the State of Tennessee agreed to pay OmniCare-TN up to $7.5 million as necessary to meet its statutory net worth requirement as of June 30, 2002." CAC ¶ 92 (quoting UAHC's January 2004 quarterly report). *See also id.* ¶¶ 99, 101. "OmniCare-TN received a permitted practice letter from the State of Tennessee to include such $7.5 million receivable in its statutory net worth at June 30, 2002." *Id. See also id.* ¶¶ 99, 101.

[7] "The above-described ... contractual amendment also extended the term of OmniCare-TN's TennCare contract to December 31, 2004, with provisions for automatic one-year renewals thereafter in certain circumstances." CAC ¶ 94 (*quoting* UAHC's April 2004 quarterly report).

quarterly and annual reports.[8] When these statements are read in their entirety, however, they clearly do not tout increased revenues as Plaintiffs suggest, but rather explain the changes in payment structure under the renewed CRA and the effect the change from quarterly to monthly payments would have on monthly cash flow. Unlike *Helwig*, where the defendants' statements, under the circumstances, contained implicit representations that the defendants were not aware of any facts that would undermine their characterization that the projected earnings and future outlook were favorable, UAHC's statements do not carry any implicit representations about the future. Just as in *Sofamor Danek*, they are merely accurate reports of historical fact that are not contradicted. Accordingly, no further disclosure is necessary to prevent them from becoming misleading under the circumstances.

The Court finds Plaintiffs' reliance on statements concerning government regulation to be misplaced. Plaintiffs argue that by mentioning that the CRA was subject to government regulation, UAHC had a duty to go further and disclose that the CRA could be terminated and speculate as to the possible consequences of the termination. *See* CAC ¶¶ 96, 98. However, Plaintiffs' characterization of the statements regarding government regulation is inaccurate. Plaintiffs claim that UAHC's purpose in discussing the government regulations "was to communicate to investors that [UAHC] was aware of the importance of adhering to State regulations and provisions of the CRA." Pls.' Brief at 6. However, when qualified by the surrounding language and placement within the SEC filings, these statements are nothing more than boilerplate disclosures which inform

---

[8] The clearest example of this is Plaintiffs' treatment of UAHC's September 2000 annual report in which Plaintiffs omit relevant contextual language and juxtapose paragraphs that were in reality separated by 19 pages of text. *Compare* Pls.' Brief at 4, *with* CAC ¶ 60, *and* United American Healthcare Corp, Form 10-K Annual Report, *available at* http://www.sec.gov (Sept. 28, 2000).

investors that regulations exist. *See Anderson v. Abbott Laboratories*, 140 F.Supp.2d 894, 905 (N.D. Ill. 2001). As the court noted in *Anderson*, all of this information could be obtained from the Code of Federal Regulations ("CFR") or by looking at the CRA itself. *See*, *e.g.*, 42 C.F.R. § 438.1 *et seq*. UAHC said nothing company specific and said nothing about UAHC's compliance with the CRA's conflict of interest provisions. No reasonable investor would conclude, based on these statements, that UAHC had no conflicts of interest or government regulation problems. *See Anderson*, 140 F.Supp.2d at 905. Therefore, simply mentioning the fact of government regulation did not require UAHC to go further and speculate about possible regulatory action in the future.

Plaintiffs have also suggested that the excerpts included in the CAC tout UAHC's business going forward and are misleading for not disclosing future risks to the CRA. This is clearly not the case. The only statements which the Court can possibly construe as forward looking concern scheduled renewals of the CRA. *See* CAC ¶¶ 92, 96.  Plaintiffs seem to contend that by stating that the CRA was extended to a certain date, UAHC represented that it would not breach the contract or guaranteed that the CRA would continue in the future. However, these statements are included in a historical review of past amendments to the CRA, and no reasonable investor would interpret a statement that a contract was renewed until a certain date, or provided for annual renewals, as a guarantee that it will not end prematurely. *See Kinder-Morgan*, 287 F.3d at 998 (recognizing that "the accurate reporting of historic successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future."). Furthermore, analysts familiar with government healthcare contracts are sophisticated enough to realize that such government contracts have infinite contingencies. Equipped with this knowledge, analysts can adequately assess

19

the risks associated with such contracts and take the providers' statements for what they are worth, thus including these risks in the market price.

Plaintiffs' argument that UAHC's discussion of the CRA alone required it to disclose all information related to the CRA, including the possible breach, is also unpersuasive. "Merely mentioning a topic ... does not require the company do disclose every tangentially related fact that might interest investors, only those that are sufficiently important." *Anderson*, 140 F.Supp.2d at 903. In the case of uncharged illegal activity, such as the alleged breach of the CRA, courts have required a direct nexus between the illegal conduct and the statements beyond the fact that discovery of the conduct would adversely affect the defendant's business. *See id.*; *Menkes v. Stolt-Nielson S.A.*, 2005 WL 3050970 (D. Conn. 2005). *See also In re Par Pharm., Inc., Sec. Litig.*, 733 F.Supp. 668, 677-78 (S.D. N.Y. 1990) (denying motion to dismiss securities fraud claims based upon failure to disclose a scheme to bribe FDA officials for the purpose of obtaining expedited approval of new drug applications because defendants compared the corporations successes to other corporations, projected similar results in the future, and conveyed the impression that defendants' success was due to a particular expertise in obtaining FDA approvals); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *4 (S.D. N.Y. 2000) (denying motion to dismiss securities fraud claims based upon anti-competitive agreement and finding that defendants had a duty to disclose the anti-competitive conduct because the corporation stated that competition was "intense" with its "primary auction competitor," which was a party to the anti-competitive agreement). This same principle is consistent with the holding in *Helwig* and other cases discussing the duty to disclose to prevent prior statements from becoming misleading. *See Helwig*, 251 F.3d 540 (holding that the company's statements that its earnings projections would hold and that it could not predict the effects of the Balanced Budget

20

Act was misleading in light of company's knowledge that the Balanced Budget Act would adversely affect its business). *Compare In re Citigroup, Inc., Sec. Litig.*, 330 F.Supp.2d 367 (S.D. N.Y. 2004) (dismissing plaintiffs' securities fraud claim where company's alleged misconduct had no connection to alleged misrepresentations).

In contrast to the cases requiring disclosure, the defendants' statements in *Citigroup*, *In re Ford Motor Co.*, and *Sofamor Danek*, did not represent the circumstances any differently than they actually were. This was because the companies' statements were not connected in any meaningful way to the undisclosed information. Specifically, in *Sofamor Danek*, the defendant's statements looked backward to past events, and did not make any representations about the future. Disclosure of the potential future ramifications of the allegedly illegal marketing practices was not necessary to make the statements not misleading because such disclosure would not alter the meaning reasonable investors would place on those statements whatsoever. Thus the court recognized that accurate statements of historical fact do not become misleading even when less favorable results may be predictable in the future. *See Sofamor Danek*, 123 F.3d at 401 fn. 3; *Kinder-Morgan*, 287 F.3d at 998; *In re Convergent Technologies, Sec. Litig.*, 948 F.2d 507, 512-13 (9th Cir. 1991).

Unlike the cases regarding uncharged illegal activity that required disclosure, UAHC did not make any statements with regard to compliance with the CRA, represent that it did not have conflicting relationships, or discuss consulting agreements whatsoever. Instead, consistent with both the cases requiring disclosure and those finding disclosure unnecessary, UAHC's general discussion of the CRA was too attenuated from the alleged illegal conduct to require disclosure. Just as in *Sofamor Danek*, UAHC's statements look backward and disclosure of possible future events would not alter their meaning at all. Plaintiffs have not alleged facts that call the accuracy of UAHC's

21

statements or their representations into question. Therefore, UAHC's general discussion of the CRA does not give rise to a duty to disclose.

Finally, the Court rejects Plaintiffs' contention that the April 15, 2005, press release was misleading for down-playing the significance of UAHC's payments to Senator Ford and expressing UAHC's belief that its conduct was consistent with the terms of the CRA. Consistent with the principle that a corporation has no duty to accuse itself of wrongdoing, "where there exists a good faith dispute as to facts or an alleged legal violation, the [law] only requires disclosure of the dispute." *City Capital Assoc. v. Interco, Inc.*, 696 F.Supp. 1551, 1556 (D. Del. 1988). As long as the corporation discloses to investors "that a good faith dispute exists as to an alleged violation of law, [an investor] has sufficient information to make a rational and informed decision." *Id.* at 1557 (discussing disclosure in the context of a tender offer).

In the April 15 press release, UAHC informed investors that it had been paying Senator Ford for consulting work and of its opinion that these payments were legal. "Investors can evaluate this sort of posturing for what it is worth." *Abbott*, 140 F.Supp.2d at 907. Plaintiffs have not alleged any facts, other than their conclusion that UAHC's payments constituted a breach, which indicate that UAHC did not have a good faith basis for maintaining its innocence. The Court finds that Plaintiffs have not pled facts which render the April 15, 2005, press release misleading.

Based on the foregoing reasons, Plaintiffs have failed to show that the failure to disclose the alleged breach of the CRA rendered any of UAHC's statements misleading. This result follows from the language of Rule 10b-5, which requires that omissions render prior statements misleading, "*in light of the circumstances in which they were made.*" 17 C.F.R. § 240.10b-5 (emphasis added). Having failed to allege any actionable false statements that would require additional facts to not be

22

misleading, Plaintiffs must show a failure to disclose that which UAHC had a duty to disclose. *See In re Ford Motor Co.*, 184 F.Supp.2d at 633.

The Sixth Circuit's cases "firmly establish the rule that soft information ... must be disclosed only if ... virtually as certain as hard facts." *Sofamor Danek*, 123 F.3d at 402. Plaintiffs have not alleged facts demonstrating that UAHC's alleged breach of the CRA and consequences thereof were virtually as certain as hard facts. Therefore, UAHC did not have a duty to disclose. *See id.*

Plaintiffs have not alleged facts that demonstrate OmniCare breached the CRA or that a breach of the CRA was virtually as certain as hard facts. The only facts Plaintiffs have alleged are that UAHC made consulting payments to Senator Ford and that the CRA prohibited Tennessee employees from receiving benefits from state contractors under certain circumstances. The CRA prohibited OmniCare from paying Tennessee employees in exchange for work done related to the CRA using funds derived from the CRA. *See* CAC Ex. 1 at 189. Further, the CRA prohibits gratuities from being paid to Tennessee employees using funds from the CRA. *See* CAC Ex. 1 at 196. Finally, the CRA required OmniCare to certify to the best of its knowledge that no Federal funds were used for lobbying. *See* CAC Ex. 1 at 196.

Contrary to Plaintiffs' belief that the CAC convincingly proved that UAHC's payments to Senator Ford constituted a breach of the CRA, the CAC does not contain sufficient facts to show that a breach was virtually as certain as a hard fact. The CRA clearly required more than just payments to a state employee in order for a breach to occur; instead, it prohibited payments, gratuities and lobbying under certain circumstances. The CAC fails to adequately allege that these circumstances existed. There are no facts showing that Senator Ford's work for UAHC related to the CRA, that he was payed with funds generated from the CRA, or that UAHC lobbied using Federal funds. To date,

23

after UAHC disclosed its payments to Senator Ford and following an investigation by Tennessee authorities, the state has still not asserted that the CRA was breached, demonstrating the conclusory nature of Plaintiffs' allegations. Thus, the breach of the CRA that Plaintiffs allege should have been disclosed was not virtually as certain as a hard fact at the time of any of the allegedly misleading statements.

Moreover, Plaintiffs fail to mention that the decision to terminate the CRA or declare a breach was within the state of Tennessee's discretion, which only could have resulted in a variety of penalties or no penalties at all.[9] Thus, even if UAHC's consulting agreement with Senator Ford constituted a breach of the CRA, the consequences stemming from the breach were entirely contingent in nature, and Tennessee could have excused the breach if it wished. As such, UAHC had no duty to accuse itself of wrongdoing or speculate as to the possible consequences of the alleged breach. *See Par Pharm*., 733 F.Supp. at 668 (stating that there is no generalized duty to disclose potential impact of end of a "bribery scheme" on a company, as "the company was not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the bribery scheme was discovered, disclosed or terminated ...."). Accordingly, UAHC "cannot be held liable for failing to 'disclose' what would have been pure speculation." *Id.*

The circumstances of this case are substantively similar to those in *Sofamor Danek*. Just as in *Sofamor Danek*, UAHC made historical statements regarding its business. Further, UAHC, like the defendant in *Sofamor Danek*, engaged in activity that was allegedly illegal and, if discovered,

---

[9]In fact, the possible consequence of a breach could be determined by examining the CFR and the CRA itself. Thus, the possible consequences of a breach would not have altered the total mix of information available to investors and would be immaterial.

could have negatively affected its business. Finally, and apart from whether UAHC's conduct was actually illegal, just as in *Sofamor Danek* the market was aware that certain practices, namely providing benefits to Tennessee employees under certain circumstances, were prohibited. Under similar circumstances, the court in *Sofamor Danek* concluded that the defendant did not have to disclose its allegedly illegal marketing practices and the possible negative consequences, even if investors would have very much liked to have known this information. Similarly, UAHC had no duty to disclose its allegedly illegal consulting agreement, even though Plaintiffs would have liked to have known about it. This is because the legality of UAHC's consulting agreement, like the legality of the defendant's marketing practices in *Sofamor Danek*, was soft information, which must be disclosed "only if ... virtually as certain as hard facts." *Sofamor Danek*, 123 F.3d at 402. Since Plaintiffs' allegation that the consulting agreement with Senator Ford breached the CRA was not certain and, as a result, neither were the consequences of a breach, UAHC had no duty to disclose this information.

In short, Plaintiffs' claim is based entirely on the existence of the possibly illegal consulting agreement between UAHC and Senator Ford. However, the non-disclosure of illegal, or in this case potentially illegal, conduct is not necessarily misleading in itself. "The private cause of action under § 10(b) and Rule 10b-5 is designed to implement the Congressional intent to regulate securities transactions." *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 599 (3rd Cir. 1976). The anti-fraud provisions were not intended to provide shareholders with an avenue for relief against executives for alleged illegal practices or corporate mismanagement. *See Citigroup*, 330 F.Supp.2d at 377 (stating "[t]he securities laws were not designed to provide an umbrella cause of action for the

25

review of management practices, nor is 'fraud by hindsight' a viable basis upon which to challenge management practices that ultimately result in losses.").

In the present case UAHC's actual statements were not misleading. Without some sort of misleading statement or omission, there can be no claim for securities fraud under § 10(b) and Rule 10b-5. The mere fact that UAHC's payments to Senator Ford may have been illegal is not grounds for a cause of action under the securities laws. Furthermore, there is no factual allegation to support Plaintiffs' conclusion that doomsday sanctions were imminent prior to the actual issuance of notice of administrative supervision. Plaintiffs argue that sanctions were not imposed earlier because the payments to Senator Ford were kept secret. Yet, even after the existence of the payments were made public no penalties, other than administrative supervision, were imposed nor was any breach asserted. Additionally, the CAC does not allege that UAHC's stock price changed at all in response to the disclosure of the payments to Senator Ford. Plaintiffs' case appears to be a claim of fraud by hindsight and, therefore, must be dismissed.

## B.  Scienter

Even if the Court were to conclude that UAHC's statements were rendered misleading for failing to disclose the alleged breach of the CRA, Plaintiffs have not plead facts giving rise to a strong inference of scienter as required by the PSLRA. Thus, the CAC must be dismissed for this reason.

### 1.  Pleading Scienter

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). The requisite state of mind is scienter, "a mental state embracing intent to deceive,

26

manipulate, or defraud." *Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). Sixth Circuit case law establishes that a plaintiff may adequately plead scienter by alleging with particularity facts giving rise to a strong inference of recklessness. *See Helwig*, 251 F.3d at 551-52; *In re Ford Motor Co., Sec. Litig.*, 381 F.3d 563, 567-68 (6th Cir. 2004). Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Helwig*, 251 F.3d at 550. In light of the PSLRA, "inferences of scienter do not survive if they are merely reasonable ... [r]ather inferences of scienter survive a motion to dismiss only if they are *both reasonable and strong inferences*." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999) (emphasis added).

The court in *Helwig* determined that the inquiry into scienter involves a "sifting of the allegations in the complaint," noting that "recklessness in securities fraud is an untidy, case-by-case concept." *Helwig*, 251 F.3d at 551. Due to the fact intensive nature of the inquiry, bare allegations of motive and opportunity to commit fraud, while relevant, are not sufficient on their own to produce strong inference of scienter. *See id.* at 550. The court recognized several factors outlined by the First Circuit that are usually relevant to scienter:

(1)   insider trading at a suspicious time or in an unusual amount;

(2)   divergence between internal reports and external statements on the same subject;

(3)   closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4)   evidence of bribery by a top company official;

(5)   existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement;

(6)   disregard of the most current factual information before making statements;

(7)  disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8)  the personal interest of certain directors in not informing disinterested directors on an impending sale of stock; and

(9)  the self-interested motivation of defendants in the form of saving their salaries and jobs.

*Id.* at 552 (*quoting Greebel*, 194 F.3d at 196). This list, while helpful in guiding the Court's inquiry is non-exhaustive. *See id.* "The determination of whether Plaintiffs have sufficiently alleged the requisite state of mind as to each of the Defendants, therefore, requires a 'fact sensitive analysis of the Complaint's allegations 'to determine whether the facts as pled produce a strong inference that [each of the particular Defendants] acted at least recklessly." *D. E. & J.*, 284 F.Supp.2d at 742 (*quoting Ford Motor Co.*, 184 F.Supp.2d at 630).

### 2. *The Sufficiency of Plaintiffs' Pleadings*

UAHC argues that the CAC does not plead facts sufficient to give rise to a strong inference of scienter with respect to any individual Defendant. In the present case, Plaintiffs have relied on group pleading for virtually all of their allegations of scienter. Aside from Defendant Howard, Plaintiffs' allegations of scienter consist of the general assertions that the individual Defendants held high ranking positions with UAHC; that because of these high ranking positions they had access to inside information that was not available to the public; that the individual Defendants had the ability to control what information UAHC disclosed; that the individual Defendants prepared and/or reviewed the reports containing the alleged misleading statements; and that in light of the foregoing allegations, Defendants were reckless for not disclosing the alleged breach of the CRA and the

possible consequences. The Court finds that these allegations do not give rise to a strong inference of scienter.

While courts are divided on the issue of whether group pleading has survived the passage of the PSLRA, "those courts that have continued to apply the group pleading doctrine have held that scienter must be pled separately as to *each* defendant." *Id.* at 742 (emphasis in original). *See*, *e.g.*, *In re Lernout & Hauspie, Sec. Litig.*, 208 F.Supp.2d 74, 84 (D. Mass. 2002) (group publication doctrine "does not, however, obviate the requirement that a court evaluate separately the allegations concerning the scienter of each of the individual defendants"); *In re Baan Co., Sec. Litig.*, 103 F.Supp.2d 1, 17-18 (D. D.C. 2000) (group publication doctrine applies to attribute misrepresentations but scienter must be pleaded as to each defendant); *In re Sunbeam, Sec. Litig.*, 89 F.Supp.2d 1326, 1340-41 (S.D. Fla. 1999) ("[G]roup pleading does not apply to the [PSLRA's] scienter requirements"). This result follows from the PLSRA's requirement that "the complaint, shall with respect to *each act or omission* ... state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).

### i. Defendants Brooks, Goss, Harris, Moses and Jackson

Plaintiffs' allegations with respect to these Defendants[10] allege nothing more than characteristics of all corporate officers and directors. Plaintiffs have not pled any facts, other than that certain individual Defendants signed certain documents, that show that any Defendant actually reviewed or prepared a quarterly or annual report or had any reason to know of the misleading nature

---

[10]While the original complaints named Goss and Moses as Defendants, the CAC does not include Defendants Goss and Moses in its definition of Individual defendants and contains no allegations regarding either of them.

of the statements contained in them. Rather, Plaintiffs' allegations focus on the likelihood that the individual Defendants knew or had reason to know of UAHC's payments to Senator Ford. However, even if they did know of the payments, this fact alone does not permit an inference that they were reckless in not disclosing it. This point is obviated by the fact Plaintiffs have not alleged that UAHC's stock price changed even when the payments were disclosed in the April 15, 2005, press release. At most, Plaintiffs' allegations demonstrate that the individual Defendants had an opportunity to defraud, which, on its own, is not sufficient to give rise to a strong inference of scienter. *See Helwig*, 251 F.3d at 550 (stating that "plaintiffs cannot simply plead 'motive and opportunity as a mantra for recovery under the Reform Act.").

In further support of their argument that the individual Defendants acted with scienter, Plaintiffs point to the absence of evidence proving that Senator Ford's activities were conducted outside of Tennessee. The Court concludes that the absence of evidence disproving an intent to deceive cannot be used to create a strong inference of scienter. Plaintiffs have not alleged facts indicating that UAHC ordinarily or in the ususal course of business kept or produced records evidencing where its consultants worked. *See*, *e.g.*, *In re Comshare*, *Inc., Sec. Lit.*, 183 F.3d 542, 554 (6th Cir. 1999). Thus if the Court were to infer scienter from the mere absence of such records the purpose of the PSLRA to prevent frivolous class actions would be undermined by essentially creating a presumption of scienter unless the defendant could show facts demonstrating that it acted innocently. Consequently, the Court refuses to infer scienter from the fact that UAHC did not possess documents supporting its statement that Senator Ford's work was conducted outside of Tennessee.

30

Plaintiffs also allege in the broadest of terms that the individual Defendants' certification of the accuracy of the quarterly and annual reports supports a strong inference of scienter. The Court disagrees. This certification is required of all corporate officers and directors and says nothing about the Defendants' intent in the present case. *See Ley v. Visteon Corp.*, 2006 WL 2559795 (E.D. Mich. 2006). *See also Citigroup*, 330 F.Supp.2d at 380 (refusing to infer scienter from motives or duties common to all corporations and their insiders). Accordingly, these certifications, without more, do not permit a strong inference of scienter.

Finally, the Court rejects Plaintiffs' argument that UAHC's subsequent disclosure of the payments to Senator Ford implies that it recklessly concealed this fact in earlier statements. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Comshare,* 183 F.3d at 553.

Conspicuously absent from the CAC are any of the factors supporting an inference of scienter identified by the court in *Helwig*. Plaintiffs have not alleged that any insider trading took place.[11] There is no allegation that the alleged misleading statements were contradicted in any way by internal reports on the same subject. There is no allegation of bribery by a top company official. Plaintiffs have not alleged the existence of an ancillary lawsuit charging fraud against UAHC and a prompt settlement. Further, Plaintiffs have not alleged that any Defendant disregarded the most current factual information before making statements. Plaintiffs have not alleged that accounting information was a disclosed in such a way that its negative implications could only be understood by someone with a high degree of sophistication. Plaintiffs have not alleged facts showing that any

---

[11]There is authority for the proposition that the absence of insider trading supports an inference against scienter. *See D. E. & J.*, 284 F.Supp.2d at 743 fn. 22; *In re Credit Acceptance Corp., Sec. Lit.*, 50 F.Supp.2d 662, 670 (E.D. Mich. 1999).

Defendant had a personal interest in not informing others of an impending sale of stock. Finally, Plaintiffs have not alleged facts indicating the Defendants were motivated to save their salaries and jobs. Consequently,  aside from Defendant Howard, the CAC alleges virtually no facts leading to a strong inference of scienter. Therefore, Plaintiffs have failed to state a claim as to Defendants William Brooks, Tom Goss, Stephen Harris, Gregory Moses, and William Jackson.

    *ii.  Defendant Howard*

    The majority of the CAC's scienter allegations concern Defendant Howard and his involvement with Senator Ford and Doral Dental via MCS. Defendant Howard was the CEO of OmniCare during the proposed class period. According to Bridgette Greene, a former vice-president of OmniCare, Lorenzo Harris,[12] OmniCare's CFO, informed her in December 2003 that UAHC was paying Senator Ford over $100,000 per year, and that she should keep quiet about the payments to Ford. *See* CAC ¶ 26, 115. Moreover, Greene stated that when Defendant Howard learned that Lorenzo Harris had disclosed the payments to her and others, Howard threatened to fire him. *See id.* ¶ 115. In addition, the Tennessee Department of Commerce, in its order of administrative supervision, concluded that Defendant Howard had twice provided false information when asked about OmniCare's consulting contracts.[13]

    Furthermore, Defendant Howard was a partner in MCS, which assisted Doral Dental in procuring a TennCare contract. MCS in turn paid Senator Ford for his work on behalf of the

---

[12]Lorenzo Harris is not a party to this action and is to be distinguished from Defendant Stephen Harris.

[13] While Defendant Howard had an affirmative duty to disclose the consulting arrangements in his responses to the Department of Commerce inquiries, these statements are not alleged as a basis for securities fraud.

partnership. Senator Ford did not disclose his relationship to MCS to the Senate Ethics Committee, and claimed that his work for Doral Dental was performed outside of Tennessee. However, a report prepared by the Tennessee attorney general indicated that Ford may have done work in Tennessee on behalf of Doral. Plaintiffs allege that because Ford's explanation regarding his work for Doral may have been false, UAHC's similar explanation of Ford's work on behalf of UAHC–that it was performed outside of Tennessee–is also false, which is evidence of scienter.

While Plaintiffs' showing of scienter with respect to Defendant Howard is more developed than their showing as to the other individual Defendants, the Court finds that Plaintiffs have not alleged facts supporting a strong inference that Defendant Howard's conduct was reckless. Plaintiffs' allegations establish that Defendant Howard knew that UAHC was paying Senator Ford as a consultant and that he had attempted to conceal this fact; however, the Court cannot infer that Defendant Howard attempted to deceive the public by failing to disclose UAHC's payments. Moreover, Plaintiffs have not alleged facts showing that Defendant Howard knew or should have known that UAHC's consulting agreement violated the CRA. Plaintiffs have not pled facts showing that a breach was certain or that penalties were likely prior to the Department's order of administrative supervision. To date, the state of Tennessee has not concluded that UAHC's agreement with Senator Ford constituted a breach. Therefore, it would not have been unreasonable, let alone grossly unreasonable, for Defendant Howard to conclude that this information did not have to be disclosed in UAHC's annual and quarterly reports. Accordingly, the Court cannot infer that the danger of misleading the public by not disclosing this information under the circumstances in which UAHC spoke "was so obvious that any reasonable man would have known it." *Comshare*, 183 F.3d at 550. *See also Helwig*, 251 F.3d at 550.

33

Furthermore, similar to Plaintiffs' scienter allegations concerning the other individual Defendants, the CAC does not allege any of the factors outlined in *Helwig* with regard to Defendant Howard. Specifically, there is no allegation that Defendant Howard engaged in any insider trading or received a personal benefit from failing to inform the public of UAHC's consulting agreement with Senator Ford. *See*, *e.g.*, *D. E. & J.*, 284 F.Supp.2d at 743-44 (finding the plaintiffs' complaint did not produce strong inference of scienter where it failed to allege, *inter alia*, a personal benefit to the defendants). *See also Citigroup*, 330 F.Supp.2d at 380 (restating the Second Circuit's holding that plaintiffs must allege a concrete and personal benefit to the defendant, such as profits resulting from insider trading at artificially inflated prices). While Defendant Howard may have benefitted personally from Doral Dental's relationship with Senator Ford via MCS, Plaintiffs have not alleged any facts indicating that UAHC's relationship produced a like benefit. *See D. E. & J.*, 284 F.Supp.2d at 743-44. On the contrary, Plaintiffs' allegations tend to implicate Senator Ford more than any of the actual Defendants. Consequently, while the CAC may reasonably permit an inference of scienter, it fails to produce an inference that is both reasonable and strong with regard to Defendant Howard.

## C. GAAP Violations

The Court finds that Plaintiffs' allegations regarding Generally Accepted Accounting Principles ("GAAP") are insufficient to state a claim under § 10b and Rule 10b-5. First, Plaintiffs' allegations with respect to violations of GAAP are not pled with the particularity required by FED. R. CIV. P. 9(b). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). This is akin to supplying the essential factual background that would accompany the first paragraph of any newspaper story–that is, the who, what, when, where and how of the events at issue. *See DiLeo v. Ernst & Young*, 901

34

F.2d 624, 627 (7th Cir. 1990). In this case, Plaintiffs do not point out any specific violations of GAAP, state how UAHC's actual financial statements violated GAAP, or even identify any inaccuracies in UAHC's financial statements. Instead, Plaintiffs state that a breach of the CRA was reasonably foreseeable, should have been accounted for as a contingent liability, and failing to do so violated a list of general principles. This type of pleading is far too general to meet the particularity requirements of Rule 9(b) and, *a fortiori*, the PSLRA. *See Citigroup*, 330 F.Supp.2d at 379.

Even if Plaintiffs had satisfied the particularity requirements with respect to the alleged GAAP violations, violations of accounting principles, with out more, are insufficient to state a claim for securities fraud. *See Comshare*, 183 F.3d at 553 (6th Cir. 1999); *Citigroup*, 330 F.Supp.2d at 378 (finding "GAAP violations standing alone are insufficient to support a section 10(b) cause of action."). In the absence of allegations giving rise to a strong inference of scienter, simply alleging violations of GAAP does not state a claim under § 10b and Rule 10b-5. "[C]laims of securities fraud cannot rest on speculation and conclusory allegations." *Comshare*, 183 F.3d at 553. (*quoting San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2nd Cir. 1996)).

As previously discussed, Plaintiffs' claims are based on their conclusion that UAHC breached the CRA and would suffer doomsday sanctions as a result. However, this allegation is pure speculation as it was not certain the CRA was breached and, thus, any consequences could not be predicted with reasonable certainty. Plaintiffs have not alleged any specific facts demonstrating that UAHC had reason to question the accuracy of its financial statements or consciously disregarded "red flags" that would have alerted it to any errors. *See id.* at 554. Without an intent to deceive,

violations of accounting principles are closer to corporate mismanagement, which the federal securities laws do not govern. *See DiLeo,* 901 F.2d at 626. Therefore, Plaintiffs' alleged GAAP violations do not support a claim under Rule 10b-5.

### D. Plaintiffs' § 20(a) Claims

In order to plead a violation of § 20(a) of the 1934 Act for control person liability, the plaintiff must allege facts demonstrating that "the defendant 'controlled' another person who committed an underlying violation of the Act, *and* that the defendant 'culpably participated' in that underlying violation." *D. E. & J.*, 284 F.Supp.2d at 750 (emphasis in original). Thus, it is clear that Plaintiffs must plead a primary violation of the Act. *See id.* Since Plaintiffs in the present case have failed to adequately plead a primary violation of § 10b and Rule 10b-5, their claim of control person liability is necessarily deficient and must also be dismissed.

### V.  CONCLUSION

The Court concludes that Plaintiffs have failed to sufficiently state a claim under the heightened pleading requirements of the PSLRA. Plaintiffs' CAC fails to allege that Defendants had a duty to disclose the alleged breach of the CRA and possible penalties. Moreover, the CAC fails to plead with particularity specific facts giving rise to a strong inference that Defendants acted with scienter. Consequently, Plaintiffs' claim must be dismissed. Therefore,

IT IS ORDERED that Defendants' Motion to Dismiss is GRANTED and Plaintiffs' consolidated amended complaint is HEREBY DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that any outstanding motions are DENIED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF

36

UNITED STATES DISTRICT JUDGE

Dated:  January 30, 2007


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on January 30, 2007.


s/Marie E. Verlinde
Case Manager
(810) 984-3290